UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

BRENT BORLAND,

Defendant.

---

18 Cr. 487 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

Brent Borland defrauded investors of tens of millions of dollars by soliciting funds based on material omissions of fact. After a guilty plea and protracted sentencing proceedings, Mr. Borland was sentenced principally to a term of 84 months' imprisonment in October 2021. Mr. Borland now moves for compassionate release, in the form of a reduction in sentence to time served, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), in part based on changes in his family circumstances and in part based on his view that the Court misperceived his role in the charged offenses and the degree to which victims were harmed. The Government opposes Mr. Borland's motion. For the reasons set forth in the remainder of this Order, the Court denies Mr. Borland's motion.

**BACKGROUND**

**A.    Factual Background**

As detailed in his Revised Final Presentence Investigation Report ("PSR" (Dkt. #114)), from approximately 2014 through March 2018, Mr. Borland and his confederates solicited and received approximately $21.9 million from approximately 40 investors based upon false representations that he would use

the investors' money to construct an airport in Belize.  (PSR ¶ 13; *see also* Dkt. #106 at 2 (Government sentencing submission noting additional losses to victim investors)).  Mr. Borland did so through two entities that he owned and/or controlled: Belize Infrastructure Fund I, LLC and Borland Capital Group, LLC.  (PSR ¶¶ 10-11).  Among other things, Mr. Borland personally solicited investments from victims, and used in-person meetings, telephone calls, and emails to lure victim investors.  (*Id.* ¶¶ 15-38).

Mr. Borland promised investors high rates of return on their investments, which he represented were merely temporary "bridge financing" instruments.  (PSR ¶ 13).  As part of the scheme, Mr. Borland provided each victim-investor with a term sheet labeled "Summary of Terms for a Bridge Financing," a promissory note, a "Personal Guarantee" signed by him and his Belizean business partner, Marco Caruso, and a document labeled "Real Estate Pledge and Security Agreement."  (Dkt. #73 at 2).  Mr. Borland also represented to investors that, in addition to the personal guarantees that he and Mr. Caruso were providing, their investments would be fully secured by real property in Belize that was unencumbered by other liens or obligations.  (PSR ¶ 13).

In contrast to Mr. Borland's representations that investors would receive high rates of return within a specified time frame, all known investors in the scheme lost money.  (PSR ¶ 46).  And while Mr. Borland represented that the investments would be secured by real property, the putative collateral was improperly pledged to multiple investors and, in some cases, did not even exist

in the manner identified and described by Mr. Borland in the documents he provided to investors. (*Id.* ¶¶ 39-41).

Mr. Borland misappropriated at least $7.5 million of victim investors' funds and used most, if not all, of those funds for the benefit of himself and his family. (PSR ¶ 14). Among other things, Mr. Borland diverted investor funds to pay for personal expenses, including mortgage payments, credit card bills, and luxury automobiles. (*Id.*). Mr. Borland also created and used multiple entities to receive and disburse proceeds of his fraud in order to conceal his defalcation of victim proceeds. (Dkt. #73 at 3). Mr. Borland carried out the scheme with the help of others, including a co-conspirator who worked for him, as well as his wife and mother-in-law, the latter two of whom disbursed victim funds and controlled bank accounts through which victim funds were disbursed. (*See* PSR ¶¶ 43-44).

In addition to the charged Belizean airport scheme, the Government presented evidence of Mr. Borland's involvement in two other fraudulent schemes. The first, which operated from in or about 2007 through in or about 2010, was referred to by the Government as the "Canyon Acquisition" scheme, and involved the solicitation of primarily Canadian investors to fund real estate projects in Belize. (PSR ¶ 47). The second, which followed shortly thereafter, involved the solicitation of investors to construct a hotel in Westchester County. (Dkt. #73 at 4-5).

B.    **Procedural Background**

1.    **The Complaint and the Indictment**

Mr. Borland was initially charged in a complaint (the "Complaint") issued on May 11, 2018, with (i) conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371 (Count One); (ii) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2 (Count Two); and (iii) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 (Count Three). (Dkt. #1). He was arrested five days later, presented in this District, and released on bail. (Minute Entry for May 16, 2018).

On July 12, 2018, the Grand Jury returned an indictment (the "Indictment") charging Mr. Borland with the same three offenses listed in the Complaint. (Dkt. #11). The matter was assigned to this Court, and Mr. Borland was arraigned on the charges on July 16, 2018. (Minute Entry for July 16, 2018). During the same proceeding, the Federal Defenders of New York was appointed to represent Mr. Borland. (Dkt. #12).

2.    **The Guilty Plea**

On February 13, 2019, Mr. Borland pleaded guilty to Counts One, Two, and Three of the Indictment without a plea agreement. (Dkt. #28 (plea transcript)). During the plea proceeding, the Court reviewed with Mr. Borland a letter produced by the Government pursuant to the suggestion of the Second Circuit in *United States* v. *Pimentel*, 932 F.2d 1029 (2d Cir. 1991); in that letter,

the Government expressed its then-current belief that the applicable sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") was 151 to 188 months' imprisonment. (PSR ¶ 7).

During the plea proceeding, Mr. Borland gave the following description of his conduct:

> With respect to Count One, between 2014 and 2018, I agreed with one other person to solicit loans to fund a real estate project in Belize. We did so through the use of emails and phone calls. In soliciting the loans and then executing loan agreements, we knowingly failed to disclose a material fact to the lender, that is, that the project had already defaulted on other loans which we solicited for the same project. I personally met with at least one investor regarding this loan in my office in New York. I knew that what I was doing was wrong.
>
> With respect to Count Two, between 2014 and 2018, I personally solicited loans for a real estate project in Belize using emails, phone calls, and personal conversations. I subsequently executed loan agreements with the lenders, but I failed to disclose a material fact that the project had already defaulted on other loans which I had solicited for the same project. I knew that what I was doing was wrong.
>
> Count Three, the loans that I solicited in Counts One and Two based on a material omission in fact were wire transferred to me in New York.

(Dkt. #28 at 28-29; *see also id.* at 30-34 (Mr. Borland acknowledging, among other things, that he and his co-conspirators omitted facts that made the statements they were making inaccurate or incomplete)). At the conclusion of the proceeding, the Court accepted Mr. Borland's guilty plea. (*Id.* at 38-39).

### 3.    The Sentencing

In preparation for Mr. Borland's sentencing, the Probation Office prepared a Presentence Investigation Report.  In the second disclosure of the report, issued May 24, 2019, the Probation Office calculated a Guidelines range of 151 to 188 months' imprisonment, and recommended a sentence at the bottom of that range.  (Dkt. #38 at Sentencing Recommendation).  Defense counsel sought and obtained several adjournments of the sentencing date (*see* Dkt. #41-46), before filing Mr. Borland's sentencing submission on October 25, 2019 (Dkt. #47-50).  The Government filed a responsive sentencing submission on December 6, 2019 (Dkt. #55), and defense counsel filed a reply submission on December 20, 2019 (Dkt. #56).

Three days after Mr. Borland's reply submission was filed, defense counsel advised the Court of a breakdown in the attorney-client relationship and requested a hearing to discuss the appointment of new counsel.  (Dkt. #57).  The Court held a conference on January 6, 2020, during which it relieved the Federal Defenders as defense counsel and appointed Florian Miedel pursuant to the Criminal Justice Act.  (Dkt. #60 (transcript of conference)).  Deadlines for supplemental submissions were scheduled, and then adjourned, because of the COVID-19 pandemic.  (*See* Dkt. #64-65, 66-70).  These submissions were filed by Mr. Borland on June 16, 2020 (Dkt. #71), and July 16, 2020 (Dkt. #76), and by the Government on July 8, 2020 (Dkt. #73).  The Court held oral argument concerning certain legal issues raised in the parties' submissions on August 5, 2020, and concluded that Mr. Borland was

not entitled to a credit against his actual or intended loss figure based on the "collateral exception" set forth in the commentary to U.S.S.G. § 2B1.1 (*see* Dkt. #83 (transcript of conference) at 80-81); the Court left open the possibility, however, that he could make analogous arguments for a downward variance pursuant to 18 U.S.C. § 3553(a) (*id.* at 81).

The Court then allowed the parties to meet and confer regarding the scope of any further *Fatico* hearings. (Dkt. #79-80, 86-87, 89-90). During that time, the parties resolved the remaining factual disputes by stipulating to a Guidelines range of 121 to 151 months' imprisonment. (Dkt. #89 at 1-2). After several adjournments, sentencing was held by videoconference on October 5, 2021. (Dkt. #115 (sentencing transcript), 110 (judgment)). After obtaining Mr. Borland's waiver of in-person appearance, the Court reviewed with the parties several changes to the PSR occasioned by their stipulations. (Dkt. #115 at 2-8). The Court also heard from the Government regarding additional victims' losses that should be considered for restitution purposes. (*Id.* at 8-10). It then asked a serious of questions to clarify certain factual statements in the record. (*Id.* at 15-33). Finally, the Court listened to the parties' oral sentencing presentations, which included statements from several victims. (*Id.* at 33-51, 67-68, 69-71).

As potentially relevant to the instant motion, the Court heard at length from Mr. Borland. (Dkt. #115 at 52-64). After apologizing to his victims and to his family and thanking his counsel, Mr. Borland summarized for the Court a "deep and thorough forensic self-audit of my 11-year involvement in the Belize

7

project." (*Id.* at 53-54).  He described the offense conduct as part of a "country building project, the size and scope of which had never been done in the Caribbean Basin or in Central America." (*Id.* at 54-55).  In Mr. Borland's estimation, the problem was that it became an "all-consuming state of mind, that all-consuming state of operations where Marco [Caruso] and I failed to deliver on our promise to our investors." (*Id.* at 56).

Mr. Borland eschewed the notion that he had set out to defraud others, and blamed instead "an overly ambitious country building project, driven by two men who, with lack of foresight and perhaps lack of understanding, had limited corporate governance and oversight." (Dkt. #115 at 57).  Separately, he argued that "39 of the 40 victims have received full restitution prior to my sentencing" as a result of several civil lawsuits.  (*Id.* at 58; *see also id.* at 22-23 (Government noting "pretty acrimonious litigation" that remained pending between the victims of Mr. Borland's fraud); *id.* at 40-44 (victim statement that many of Mr. Borland's victims continued to suffer financial losses)).[1]

---

[1]    The same victim went on to describe ongoing civil litigation among the victims, in which Mr. Borland aligned with one victim, Copper Leaf LLC, against the remaining group of victims:

> Finally, I would like to address his statements that teaming with one victim, at the expense of 40 others, is demonstrating his goodwill.  First, Copper Leaf was offered an opportunity to invest with our group in Belize.  They declined, which was certainly their right. They joined with Mr. [Borland] to try to capture the assets that are now owned by our investment group.  It's fairly disingenuous for Mr. [Borland] to say that, should he prevail, his intention is to repay the other victims, which is basically our group, by giving us back the property which we already own, and either that or selling it and distributing the proceeds.
>
> ***
>
> I think Mr. [Borland]'s attempts to do his work in Belize, to come back and try to sue all the other investors, to recoup something

After taking a break to consider the parties' submissions, the Court sentenced Mr. Borland. The Court adopted the parties' Guidelines calculations and resulting sentencing range of 121 to 151 months' imprisonment, and announced its intention to vary downwardly. (Dkt. #115 at 78-79). After acknowledging that "it is rarely the case that someone constructs an investment vehicle solely for the purposes of stealing investment funds" (*id.* at 80), the Court assessed the parties' sentencing arguments, concluding:

> One thing that I have been thinking about while away from this platform was Mr. [Borland's] statement to me, which was quite articulate and quite revelatory. But what is interesting to me is that there is a degree to which there remains this romantic vision of the Belize project. It was, at least at some point, sir, a source for you of great pride. There were developments and there was recognition that you received, and even in your forensic self-audit, there is still a tremendous romanticism that attends to this project. And I don't think that romanticism extends to the victims in this case. I do hope that they received some peace from your statements to them about your attention to their victim impact statements and your attention to their losses. But I suppose, in listening to you wax eloquent about this Belize project, I can understand how easy it was for you to engage in conduct to try and keep it alive.
>
> I do, with respect to that, however, find it noteworthy, if not troubling, that you repeatedly said to me today that you ascribed greater significance to your inaction. Because, to me, it's your actions that bring you here and not your inactions. There were also other statements that gave me pause. A suggestion that you might have avoided all of this with a capable general counsel. The suggestion that safeguards fell by the

───────────────

that in some cases he never owned in the first place, is completely disingenuous. And for him to say he is trying to show good faith by helping one person so that he can then help us all, I don't want to say it's comical, it's sad, it's very sad.

(Dkt. #115 at 42, 44).

> wayside. The suggestion that somehow this was a
> failure or deficiencies of corporate governance
> knowledge, or that you got ahead of your skis. I
> disagree with almost all of that because you don't need
> a general counsel to tell you not to lie to people, you
> don't need a general counsel to know that, if you pledge
> a security, you can't tell people that you haven't pledged
> a security. And so I find that there is still, even in your
> efforts to understand what you did, and to
> communicate to me what you did, there is still not a
> full-throated acceptance of responsibility. And that is
> disappointing, but it is factual.

(*Id.* at 83-84). Ultimately, the Court varied downwardly to an aggregate term of 84 months' imprisonment. (*Id.* at 85).

Mr. Borland appealed from the Court's sentence. (Dkt. #113). On appeal, he challenged both his restitution figure and the calculation of his Guidelines range. By summary order issued on June 20, 2023, the Second Circuit affirmed the Court's sentence. (Dkt. #122 (mandate)).

### 4.    The Instant Motion

On December 14, 2023, Mr. Borland filed a *pro se* motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). (Dkt. #124). The Government filed an initial response in opposition on February 5, 2024. (Dkt. #130). Thereafter, Mr. Borland requested that the Court issue subpoenas to several third parties for the purpose of challenging statements made by certain of the victims to the Court. (Dkt. #131). The Court reacted swiftly and definitively, making clear its dismay at Mr. Borland's continued efforts to understate the effects of his criminal conduct:

> Mr. Borland's request for this Court to authorize the
> filing of several third-party subpoenas is DENIED. As
> the Court understands Mr. Borland's counseled

10

submission (Dkt. #131), the purpose of the subpoenas
is to obtain information to rebut claims at sentencing
by several of the victims in this case regarding (i) the
ownership of certain real estate assets in Belize and
(ii) the proper valuation of same.  To begin, the Court is
skeptical of challenges to ownership and valuation
issues in the procedural context of a compassionate
release motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).
Mr. Borland is reminded that he and the Government
ultimately agreed as to the appropriate application of
the United States Sentencing Guidelines ("U.S.S.G." or
the "Guidelines") to his case, including the relevant loss
figure, and also agreed on a restitution figure.  For this
and other reasons, the Second Circuit found on appeal
that Mr. Borland had waived challenges both to his loss
figure calculation and his restitution figure.  *United
States* v. *Borland*, No. 21-2761-cr, 2023 WL 4072830,
at *2-3 (2d Cir. June 20, 2023).  This Court will not
permit him to renew those challenges here, in the guise
of a compassionate release argument.  *Cf.* 18 U.S.C.
§ 3664(j)(2) (allowing for reduction of restitution figure
where victim receives "compensatory damages for the
same loss" in another federal or state proceeding).

More to the point, Mr. Borland misperceives the
significance of the loss figure and restitution amount to
the sentence the Court ultimately imposed.  The Court
recognized, among other things, the imprecision of the
loss figure in this case and its diminished utility as a
proxy for culpability. (Dkt. #152 at 82-85).  Much more
important to the Court was the length of time over
which Mr. Borland's fraud was perpetrated, the number
of investors who were victimized, and the qualitative
losses to each victim (*e.g.*, the loss of retirement or
college funds, or the need to continue working).  Even
with those aggravating factors, the Court took account
of Mr. Borland's personal circumstances and varied
downward significantly, nearly halving the low end of
the applicable Guidelines range.

It also bears noting that the information Mr. Borland
seeks to present may not be the panacea he envisions.
Mr. Borland did not give property away proactively to
make victims whole; rather, victims were forced to bring
civil litigations, including against other victims, in order
to obtain property in settlement agreements that were

reached, some after Mr. Borland had been sentenced. The record before the Court, including recent victim impact statements, makes clear that the victims have not been made whole; that many are still struggling financially; and that victims will need to invest additional funds before the properties they received in settlement might yield any returns. Indeed, the documents submitted to the Court indicate that one component of the settlement requires one group of victims to make payments to another victim.

Mr. Borland's application for compassionate release is troubling to the Court for a separate reason. A recurring theme at sentencing, which is only underscored by his arguments on appeal and in the current motion, is that Mr. Borland will not accept responsibility for his criminal conduct. (Dkt. #115 at 84 (The Court: "And so I find that there is still, even in your efforts to understand what you did, and to communicate to me what you did, there is still not a full-throated acceptance of responsibility. And that is disappointing, but it is factual.")). In this regard, the Court wishes to see the communications to which the Government refers at footnote 4 of its submission, and directs the Government to inquire promptly into their availability. If indeed Mr. Borland sought false statements or false recantations from the victims in this case, such actions will impact the Court's consideration of his motion.

(Dkt. #132).

Mr. Borland submitted a counseled reply to the Government's opposition papers on February 27, 2024. (Dkt. #135). Thereafter, the parties exchanged letters concerning Mr. Borland's eligibility for release to a residential reentry center or home confinement. (Dkt. #137-141). The Court understands from the federal Bureau of Prisons ("BOP") that Mr. Borland is currently being evaluated for placement in a residential reentry center, but that (i) such placement has not happened yet and (ii) there is no definite timeline for its

occurrence. For avoidance of doubt, the Court will *not* be addressing Mr. Borland's claims regarding the computation of credits against his sentence in resolving the instant compassionate release motion. Should Mr. Borland take issue with BOP's computations of his sentence, including credits against that sentence, the proper vehicle is a habeas petition in the district of his confinement, pursuant to 28 U.S.C. § 2241. *See Jiminian* v. *Nash*, 245 F.3d 144, 146 (2d Cir. 2001) (observing that a Section 2241 petition "generally challenges the execution of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions."); *see also United States* v. *Yong*, No. 95 Cr. 825 (JS), 2024 WL 3648259, at *7 (E.D.N.Y. Aug. 5, 2024) (rejecting efforts to challenge delay in grant of parole through motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)).

## DISCUSSION

### A. Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act, a court may reduce a defendant's sentence upon motion of the Director of the BOP, or upon motion of the defendant. A defendant may move under Section 3582(c)(1)(A)(i) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

13

When considering an application under Section 3582(c)(1)(A)(i), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i); *see generally United States* v. *Kimbell*, No. 21-288, 2021 WL 5441249, at *1 (2d Cir. Nov. 22, 2021) (summary order).  The Second Circuit has summarized the standards pursuant to which district courts must evaluate compassionate release applications:

> A court deciding a compassionate release motion can consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it]."  *United States* v. *Brooker*, 976 F.3d 228, 237 (2d Cir. 2020).  But there are three requirements that must be satisfied before a court can grant such relief.  First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting such relief from prison authorities.  Specifically, an inmate may ask the sentencing court to consider reducing a sentence only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A); *see also United States* v. *Saladino*, 7 F.4th 120, 124 (2d Cir. 2021) (holding that the government may waive or forfeit the exhaustion requirement).  Second, a court must "consider[ ] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A); *see* [*United States* v. *Jones*, 17 F.4th 371, 374-75 (2d Cir. 2021)].  Section 3553(a), in turn, lists numerous factors a court must review when imposing a sentence.  These include, as most relevant here, "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed ... to reflect the seriousness of the

14

offense, to promote respect for the law, and to provide just punishment for the offense"; "the need for the sentence imposed … to provide the defendant with … correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). Third, the inmate must demonstrate that his proffered circumstances are indeed "extraordinary and compelling" such that, in light of these § 3553(a) factors, a sentence reduction is justified under § 3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed.

*United States* v. *Keitt*, 21 F.4th 67, 71 (2d Cir. 2021); *accord United States* v. *Halvon*, 26 F.4th 566, 570 (2d Cir. 2022). The district court's discretion includes the power to reduce, as well as to eliminate, the remaining term of a defendant's sentence. *See Brooker*, 976 F.3d at 237.

In Amendment 821 to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), effective as of November 1, 2023, and later made retroactive, the Sentencing Commission amended the policy statement contained at U.S.S.G. § 1B1.13 in order to provide guidance as to what constitutes extraordinary and compelling circumstances in defendant-initiated (as distinguished from BOP-initiated) compassionate release requests. This amendment "now controls the analysis of a compassionate release motion, however initiated." *United States* v. *Lopez*, No. 16 Cr. 317-22 (PAE), 2024 WL 964593, at *2 (S.D.N.Y. Mar. 5, 2024).

As relevant here, the amended policy statement recognizes that family circumstances may constitute extraordinary and compelling reasons, as, for example, in cases involving (i) the death or incapacitation of the caregiver of the

defendant's minor child; (ii) the incapacitation of the defendant's spouse or registered partner; and (iii) analogous circumstances in which the defendant would be the "only available caregiver" for an immediate family member.  *See* U.S.S.G. § 1B1.13(b)(3); *see also id.* § 1B1.13(b)(5) (noting that extraordinary and compelling circumstances may be found where "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).").  As this Court has noted in analyzing the pre-amendment version of the guideline, "[t]he animating principle of [U.S.S.G. § 1B1.13(b)(3)] is that there exists an extraordinary and compelling reason for release when the defendant has a close family member who is completely unable to care for himself or herself and for whom the defendant would be the only available caregiver."  *United States* v. *Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020).

The "existence of 'extraordinary and compelling reasons' for a reduction does not mean that a district court must release the defendant."  *United States* v. *Madoff*, 465 F. Supp. 3d 343, 349 (S.D.N.Y. 2020).  Even if a court finds that a defendant has established an extraordinary and compelling reason for a reduction in sentence, it must still consider the Section 3553(a) factors.  *See* 18 U.S.C. § 3582(c)(1)(A)(i).  "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC),

2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

>    2.    **Analysis**

>        a.    **Mr. Borland Has Not Identified an Extraordinary and Compelling Circumstance**

The Government does not appear to dispute Mr. Borland's exhaustion of his administrative remedies, and the Court thus proceeds to consider the merits of his application.  Ultimately, the Court finds that Mr. Borland has failed to identify an extraordinary and compelling circumstance warranting a reduction in his sentence.

Mr. Borland notes that his wife, Alana Latorra-Borland, has been diagnosed with several medical issues, including angioedema (akin to hives, but involving swelling underneath the skin) and Gitelman Syndrome (a genetic kidney disorder).  (Dkt. #124, Ex. C; Dkt. #135, Ex. D).  With his opening submission, Mr. Borland included a note from Dr. Paldeep S. Atwal, his wife's treating geneticist, who opined that "given the nature of this illness and in particular due to the unpredictable severe flares she would have periods of incapacitation and inability to care for herself or her two children who are minors under 18 and unable to care for themselves or [Ms. Latorra-Borland]." (Dkt. #124, Ex. B).  Mr. Borland also included information from his wife's sister and mother, positing various reasons why they would not be suitable caregivers for his children were his wife to become incapacitated.  (Dkt. #135, Ex. B-C).

When the Government asked several follow-up questions of Dr. Atwal, it learned that "Ms. Borland has not been hospitalized in the last two years, and that Dr. Atwal has prepared a plan for Ms. Borland's care, which includes referrals to specialists, additional testing, and other continued treatment." (Dkt. #130 at 10).  Mr. Borland promptly responded with additional information, noting in his reply submission that his wife was more recently diagnosed with chondrocalcinosis (the buildup of calcium crystals in joint cartilage), which causes her "debilitating knee pain, losing the ability to walk and perform activities of daily living."  (Dkt. #135 at 2-3).

As noted, Section 1B1.13 recognizes that an extraordinary and compelling circumstance may exist where a defendant is the "only available caregiver" for an immediate family member.  *See* U.S.S.G. § 1B1.13(b)(3).  While not seeking to minimize the discomfort and debility that Mr. Borland's wife has and may continue to experience, the Court observes that her flare-ups are episodic, and not so chronic or severe as to render her completely unable to care for the couple's children.  The Court notes that, according to Dr. Atwal, Ms. Latorra-Borland's conditions are of long standing, and that she has, presumably with some assistance from family members and friends, been able to care for herself and her children during the several-year period of her husband's incarceration.  And while it is true that some courts have granted compassionate release motions predicated on family circumstances, the evidence of the defendant's criticality to the preservation of the family unit in those cases is far more substantial than that presented here.  *See, e.g.*, *United*

*States* v. *Messina*, No. 11 Cr. 31 (KAM), 2024 WL 2853119, at *6 (E.D.N.Y. June 4, 2024) (collecting and distinguishing cases in which motions were granted because of family circumstances).  Ultimately, as Dr. Atwal concludes, Ms. Latorra-Borland has a risk, but not a certainty, of future episodes of incapacitation.  (Dkt. #135 at 3, Ex. B).  On this record, the Court finds her medical conditions to be insufficient to constitute an extraordinary and compelling circumstance warranting Mr. Borland's release from custody.

   Mr. Borland's second proffered basis for compassionate release is more troubling to the Court, given its prior admonitions.  To review, Mr. Borland initially sought a credit against his Guidelines loss figure, claiming that his victims had largely been made whole as a result of receiving certain property in Belize via civil lawsuits.  *See* U.S.S.G. § 2B1.1, commentary n.3(E)(ii). However, the Court found after motion practice and oral argument that the collateral exception was not applicable, noting among other things that: (i) the victims had been obligated to bring civil lawsuits to obtain the property; (ii) title to the property was not clear, and, indeed, one group of investors had been pitted against another; (iii) there were "far too many contingencies and far too many open issues for me to find that [the exception] applies here."  (Dkt. #83 at 81).  Thereafter, the parties stipulated to the application of the Guidelines to Mr. Borland's case to forestall additional litigation.  (Dkt. #89).  Among other things, the parties stipulated to an actual loss figure of approximately $22 million, to five or more victims, and to a leadership role for Mr. Borland.  (*Id.* at 1-2).  In the same submission, Mr. Borland withdrew most of his objections to

the offense conduct discussion in the PSR.  (*Id.* at 2).  Mr. Borland later

consented to an order of restitution that specified a restitution figure of

$26,184,970 (Dkt. #109), and to an order of forfeiture that recited a forfeiture

number of $26,584,970 (Dkt. #108).

Mr. Borland now argues that (i) one or more of his victims provided false

information to the Court about the losses caused by Mr. Borland's fraudulent

scheme and (ii) post-sentencing developments confirm that his victims have

been made whole.  Not so.  The information about losses provided by victims

accorded with the parties' stipulations regarding loss, as well as their agreed-

upon restitution and forfeiture figures.  And while the litigation proceedings in

Belize between warring groups of Mr. Borland's victims may have been

resolved, the actual settlement involves most of those victims paying one

victim, Copper Leaf, some $13 million over time in exchange for clear title to

certain real properties in Belize.  As the Government observes:

> In sum, the fact remains that a group of victims who
> paid to purchase land for development in Belize, which
> Borland claimed was land that he had "pledged" to them
> as collateral but which he had failed to provide to them
> for compensation for their losses in his scheme, have
> now agreed to pay another approximately $13 million to
> another victim to end pending litigation in Belize, the
> result of which will not prevent Borland from suing
> these victims again to attempt to seek title to the
> property in dispute.  In other words, the vast majority
> of victims in this case have been victimized by Borland
> multiple times — first, Borland defrauded them in
> connection with the Belizean Airport scheme; second,
> after attempting to help themselves by purchasing the
> land that Borland claimed was "pledged" as collateral to
> them, Borland sued them to obtain right and title to the
> land; and, third, when the victims attempted to settle
> the pending litigation in Belize and, in fact, settled with

> Copper Leaf to dismiss its claims, Borland refused to be
> a party to the settlement, apparently retaining the
> ability to sue the victims once again for right to the
> property that they purchased in connection with their
> settlement with Caruso.

(Dkt. #130 at 12).

In reviewing the materials submitted by the parties, the Court is skeptical about Mr. Borland's claims of rehabilitation. For starters, while purporting to focus on making victims whole, Mr. Borland sought to obtain $1.75 million to $2.75 million for himself in the settlement negotiations. Mr. Borland is also not a party to the settlement of the intra-victim litigation, and retains the right to sue his victims in Belize over the property that they received. (Dkt. #130 at 11 n.4 and Ex. D). Finally — and most troubling to the Court — Mr. Borland attempted (through his counsel) to coerce one of the victims into "walk[ing] back" the victim's (true) statements about victim losses that were made to this Court at sentencing. (Gov't Letter dated March 3, 2024, Email Thread #3). As another attorney involved in the negotiations quipped:

> None of the investors will use the terminology "they have
> been made whole". Not a chance. As investors,
> fungible cash (in US Dollars) makes people whole. The
> investors were to be repaid in dollars and now they own
> a percentage of a company that owns land for a yet to
> be built airport. They own a lottery ticket.

(*Id.*).

To the extent that Mr. Borland is arguing that the Court should reduce his sentence because the Court misperceived the degree to which his victims had been injured by his fraudulent conduct (or, conversely, the degree to which they had been made whole by the civil litigations), the Court rejects his

argument.  As a factual matter, Mr. Borland is incorrect.  The Court did not
misperceive the state of affairs at sentencing, and post-sentencing
developments do not change the fact that all victims but one have only the
*potential* to recover their losses — and even then, only by investing additional
money and time into the property in Belize.  The Court has also repeatedly
made clear that it was more concerned at sentencing with the length and
breadth of Mr. Borland's fraudulent conduct than with the specific loss figure.
As a legal matter, Mr. Borland is also incorrect.  Post-sentencing restitution
payments, and even minor mistakes of fact at sentencing (had there been any,
which there were not), would not suffice to constitute extraordinary and
compelling circumstances.  *Cf. United States* v. *Fernandez*, 104 F.4th 420, 430
(2d Cir. 2024) ("Absent such a clear declaration of intent, we conclude that
since challenges to the validity of a conviction must be made under section
2255, they cannot qualify as 'extraordinary and compelling reasons' under
section 3582(c)(1)(A).  Compassionate release is not a channel to habeas relief
or an end run around the limitations of section 2255.").

Mr. Borland also suggests that his restitution obligations have been
discharged.  (Dkt. #124 at 20-21).  Again, the Court is less sanguine.  To the
extent that his restitution or forfeiture figures have been affected by the related
civil litigation, Mr. Borland can meet and confer with the Government to adjust
those figures, and the parties can come to the Court with any disputes.  *See* 18
U.S.C. § 3664(j)(2) (allowing for reduction of restitution figure where victim
receives "compensatory damages for the same loss" in another federal or state

proceeding). That said, Mr. Borland's payment of restitution was an obligation imposed by the Court at sentencing, and the discharge of that obligation does not itself suffice as an extraordinary and compelling circumstance. What is more, Mr. Borland's involvement in the morass of victim-against-victim lawsuits that he himself engendered, which involvement apparently extends to a misguided attempt to leverage the lawsuits into a sentence reduction, does not warrant such relief.[2]

---

[2]    Mr. Borland's remaining arguments, which are made in passing, can be dismissed more summarily. In his opening submission, Mr. Borland cited his rehabilitative efforts as a basis for release from custody. (Dkt. #124 at 22-23). Rehabilitation is not, by itself, sufficient to constitute an extraordinary and compelling circumstance, but "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d); *see also* 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."). The Court finds that Mr. Borland's proffered bases for relief do not amount to extraordinary and compelling circumstances, and will not grant his motion based on his rehabilitation alone. *Cf. United States* v. *Muyet*, No. 95 Cr. 941 (LAP), 2024 WL 2830825, at *5 (S.D.N.Y. June 3, 2024) ("Simply put, the evidence of rehabilitation offered by Defendant does not, alone or in combination with all other relevant considerations, establish extraordinary and compelling reasons for a reduction in his sentence."); *United States* v. *Raposo*, No. 98 Cr. 185 (JPC), 2024 WL 165195, at *9 (S.D.N.Y. Jan. 16, 2024) ("And given the Court's findings that [the defendant's] other arguments do not constitute extraordinary and compelling reasons, even evidence of complete rehabilitation cannot suffice."). Moreover, as noted in the text, the Court believes that Mr. Borland has overstated the degree of his rehabilitation.

In his reply submission, Mr. Borland cites the conditions of his confinement as a basis for sentence reduction. (Dkt. #135 at 5 & Ex. A). While the Court acknowledges that aspects of Mr. Borland's confinement have been challenging, the fact remains that they are common among prisons, and do not constitute extraordinary and compelling circumstances. *Cf. United States* v. *Porter*, No. 96 Cr. 515 (LAP), 2024 WL 2159850, at *5 (S.D.N.Y. May 14, 2024) ("With respect to the other hardships resulting from being incarcerated in recent years, such as repeated lockdowns, these problems are not unique to this Defendant and do not justify a reduction in sentence." (collecting cases)). It also bears noting that this Court allowed Mr. Borland to remain on bail during the worst of the pandemic-related restrictions. *Cf. United States* v. *Hudson*, No. 19 Cr. 496-01 (CM), 2023 WL 6160580, at *3 (S.D.N.Y. Sept. 21, 2023) ("By allowing [the defendant] to continue to be at large during the heart of the COVID-19 pandemic (at defendant's request, for the expressed reason of avoiding the harsh conditions of confinement owing to the pandemic), [the defendant] was spared that hardship" faced by pandemic-era prisoners.).

## 2.    The Section 3553(a) Factors Counsel Against a Reduction in Sentence

Even were the Court to have found that one or more of Mr. Borland's reasons amounted to "extraordinary and compelling," it would still deny his motion after considering the factors set forth in 18 U.S.C. § 3553(a).  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the needs "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant."  *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

Having reviewed with care the totality of Mr. Borland's most recent submissions, the Court is struck by his continued inability to accept responsibility for his fraudulent conduct.  Ever the salesman, Mr. Borland has consistently sought to reframe the narrative as one of nation-building gone wrong.  But as the Court has repeatedly explained to Mr. Borland, his criminal culpability arises not from his purported naïveté, but rather from his willingness to lie to numerous victims on numerous occasions and thereby cause them to part with tens of millions of dollars on false pretenses in service of his Belizean scheme.  At sentencing, the Court accounted for Mr. Borland's family circumstances and his expressed contrition in imposing a substantially-below-Guidelines sentence.

Mr. Borland continues to suggest that the civil litigations have resulted in his victims being made whole.  The Court disagrees, noting — as but a few

examples — the years of litigation that were required to get them the property, the imprecise value of that property, and the years and dollars that will be required to make the property commercially viable. Finally, as noted above, importuning victims to change their stories post-sentencing to support his arguments for release, on pain of impeding the settlement of civil litigation, suggests that Mr. Borland has learned little from both his prosecution and his term of incarceration.

## CONCLUSION

For the reasons set forth in this Order, the Court DENIES Mr. Borland's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

SO ORDERED.

Dated:    September 3, 2024
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge